THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
CHRISTOPHER GUTKNECHT, Defendant-Appellant.

Fifth District   No. 82—309

Opinion filed January 18, 1984.

Randy E. Blue and Larry R. Wells, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

John Baricevic, State's Attorney, of Belleville (Stephen E. Norris and Mark A. LaRose, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE KARNS delivered the opinion of the court:

Defendant, Christopher Gutknecht, was charged in an indictment with the offense of residential burglary (Ill. Rev. Stat. 1981, ch. 38, par. 19—3(a)) arising out of an incident which occurred on January 6, 1982. Defendant filed pretrial motions to suppress statements and physical evidence which were denied by the trial court. A jury in the circuit court of St. Clair County found defendant guilty of the offense charged and he was sentenced to four years' imprisonment. Defendant now appeals contending that: (1) he was arrested on less than probable cause, thereby making his arrest illegal and evidence gathered thereafter inadmissible; (2) his rights to terminate questioning and remain silent were asserted and ignored thereby making his statements thereafter to police a product of involuntary coercion; and (3) the evidence was insufficient to prove the knowledge and intent elements required by

the statute.

On January 6, 1982, the complaining witness, 75-year-old Margaret Hilger, was awakened at 3 a.m. by a man standing over her bed with a knife at her throat threatening to kill her. The evidence established that the man gained entry to her studio apartment by removing a window pane and reaching in to unlock the door. Mrs. Hilger was the only witness to the incident. She testified that the intruder wore a ski mask and gloves. He walked about the apartment, strewed her money on the floor, broke her radio, cut the telephone cord, and asked her who she was expecting. At one point he walked into her bathroom where she heard him speak "to somebody that wasn't in there." She said he threw her on the floor and left when he thought he heard a noise in the upstairs apartment, promising to "come back and finish the job if I squealed on him." The intruder left with the window pane he had removed to gain entry.

The investigation began about 11:30 a.m. on January 6. Detectives Rokita and Lindsey went to the apartment complex to interview Mrs. Hilger. There they obtained two cut pieces of her telephone cord and four pieces of window molding from the missing window near her rear door. Mrs. Hilger gave them a description of the intruder as being about 5 feet 6 inches with medium build, wearing what she thought was a knee-length tan sweater. The detectives proceeded to canvass the area knocking on apartment doors and asking other residents about the incident. Finding nothing, they returned to the station.

Detectives Knefelkamp and Boyne resumed the investigation at the apartment complex about 6 p.m. that night. Knefelkamp testified that they had spoken to approximately six tenants not interviewed previously before knocking on the defendant's door. At once the detective noticed the occupant fit the general description given by Mrs. Hilger and also noticed the occupant did not fit the general description of every other tenant interviewed to that time, i.e., elderly, widowed, retired women. Knefelkamp testified that the defendant appeared nervous. He was "[v]isibly shaking, trembling in the voice, hands were shaking, loss for words, such as this." Brief questioning followed with an advisement that the detectives might return after interviewing other tenants.

The detectives did in fact return after observing that defendant's rear door was adjacent to Mrs. Hilger's rear door in the secluded courtyard area around back of the complex. They entered defendant's apartment at which time, Knefelkamp later testified, defendant was visibly more nervous and trembling with stuttered speech. Knefelkamp observed a 10- to 12-inch dagger sitting on a window ledge across the

room. "[N]aturally [this] brought to mind the possibility this could have been the item used." At that point it was determined that "we had enough circumstantial things going on around that we better read him his *Miranda,* *** [t]his is what I did." Knefelkamp testified he was not placed under arrest but did agree to voluntarily accompany the detectives to the station for further questioning.

At the station the defendant was again given his *Miranda* warnings. No additional facts were gathered by the police from the time the defendant consented to go to the station to the time he asked to leave and was prohibited from doing so. Both parties agree that it was at this time that the defendant was formally placed under arrest. Therefore, as the State correctly suggests, it is the above-outlined facts and circumstances that must be considered to determine whether the arrest was based on probable cause. Since this is the threshold question upon which defendant's remaining alleged errors are based, we proceed to its disposition first.

■■ Section 107−2(c) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 107−2(c)) provides that a person may be arrested without a warrant when a police officer has reasonable grounds to believe that the person arrested has committed an offense. This statutory standard is synonymous with the Federal and State constitutional requirement of probable cause. (U.S. Const., amend IV; Ill. Const. 1970, art. I, sec. 6; *People v. Wright* (1974), 56 Ill. 2d 523, 528, 309 N.E.2d 537, 540.) Each case is governed by its own particular facts and circumstances. (*People v. Clay* (1973), 55 Ill. 2d 501, 504-05, 304 N.E.2d 280, 282.) The courts deal with probabilities in deciding the question of probable cause and are not disposed to be unduly technical. "These probabilities are the factual and practical considerations of everyday life on which reasonable men, not legal technicians act. *Draper v. United States,* 358 U.S. 307, 3 L. Ed. 2d 327, 79 S. Ct. 329; *People v. Fiorito,* 19 Ill. 2d 246." (55 Ill. 2d 501, 505, 304 N.E.2d 282.) The facts upon which probable cause to arrest is based need not be sufficient to convict (*People v. Williams* (1978), 62 Ill. App. 3d 874, 877, 379 N.E.2d 1222, 1225), but something more than a hunch or mere suspicion is required. *People v. Garza* (1976), 44 Ill. App. 3d 30, 34, 357 N.E.2d 1264, 1268.

The State has argued that the officers' reasonable belief that the defendant had committed the crime was based on the following facts: defendant fit the general description of the burglar; defendant was the only resident of the apartment complex fitting that description; defendant's rear door, located in a secluded area, was immediately adjacent to the victim's rear door; defendant was extremely nervous at the first

interview with the detectives and more nervous upon their return for further questioning; and defendant was in possession of a knife of the same character as that known by the detectives to have been displayed by defendant.

■ We do not believe any one of these factors by itself amounts to probable cause. Nor do we believe combinations of any two factors would amount to the same. It is arguable whether any more than two when considered together would cause a reasonable person having such knowledge to believe the defendant committed the crime under investigation. But the existence of probable cause or reasonable grounds for an arrest depends on the totality of facts and circumstances known to the officer at the time of the arrest. (*People v. Tedder* (1980), 83 Ill. App. 3d 874, 404 N.E.2d 437.) The actions of a policeman in making an arrest are to be judged by the reasoned considerations of everyday life; and any assessment of the reasonableness of the officer's conduct should take into consideration the responsibility of the police to prevent crime, to apprehend criminals, and often to act quickly in appraising data before them. *People v. Watkins* (1960), 19 Ill. 2d 11, 166 N.E.2d 433.

■ A composite picture was forming gradually from successive bits of information in the officers' minds. Upon first seeing defendant the detectives were immediately aware that his general height, build and gender matched those of the burglar described by the victim. He was oddly out of place living in a complex otherwise occupied by elderly women only. His physical proximity to the scene of the crime, his apartment's proximity to the scene of the crime and his availability to undetectable access to the scene of the crime were factors observed by the detectives. He appeared extremely nervous when interviewed. He appeared more nervous when interviewed again. The knife observed inside his apartment was known by the detectives to be of the same character as that used in the burglary. While defendant is constitutionally guaranteed freedom from unreasonable seizure, he is not immune from seizure. This right has been defined in terms of whether the arresting officer had a reasonable belief that the person seized committed the offense. We are of the opinion that these facts constitute reasonable grounds for the arresting officer to believe that at the time the arrest was made, the defendant burglarized Mrs. Hilger's apartment.

In this regard, *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, *Taylor v. Alabama* (1982), 457 U.S. 687, 73 L. Ed. 2d 314, 102 S. Ct. 2664, and *People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103, can be distinguished. In those cases, lack of proba-

ble cause was a stated premise from which it was determined that evidence gained subsequently was inadmissible. While the circumstances of the instant case may indicate that the detectives interrogated the defendant in the hope of obtaining additional information about the burglary, they do not, in our view, indicate an improper " 'quality of purposefulness' " as an " 'expedition for evidence' " in order to obtain sufficient evidence upon which to predicate the probable cause necessary for an arrest. (*Dunaway v. New York* (1979), 442 U.S. 200, 218, 60 L. Ed. 2d 824, 839, 99 S. Ct. 2248, 2259, quoting *Brown v. Illinois* (1975), 422 U.S. 590, 605, 45 L. Ed. 2d 416, 428, 95 S. Ct. 2254, 2262.) In fact, it appears that the arrest was made without any additional evidence.

Defendant's second alleged error relates to his right to terminate questioning and remain silent. About an hour after arriving at the police station and while talking to Knefelkamp and Boyne in an interrogation room the defendant indicated that he wanted to go home. Knefelkamp refused the request believing that the defendant "showed signs that he was thinking about wanting to talk about something [and] [f]rom my experience, you just know those people have got something they want to divulge to you." Shortly after this refusal, Knefelkamp testified, the defendant asked if he could be alone with Knefelkamp. Boyne left the room. The defendant thereafter gave an incriminating oral statement. According to Knefelkamp, the defendant stated that the previous evening he had consumed alcohol, LSD and amphetamines and that their combined effect "wiped him out." He described to Knefelkamp a similar type situation in which he had been involved in Effingham sometime before. He said he had been through a drug and alcohol rehabilitation center. "He advised that he did have a problem, he did need help, that he didn't want to tell me for fear of it being prejudicial to this particular incident, if in fact he had done it, which he stated he couldn't really remember ***. He said it was very possible that he could have done it, but he really couldn't say for sure, because in his words he was wiped out." Another request to leave was apparently made by the defendant in order that he might get his thoughts together and return in the morning to give a written statement. Knefelkamp responded that there would be further investigation and that the defendant had said enough to warrant holding him for additional investigation. Defendant was jailed.

The next day, the police secured defendant's consent to search his apartment. They seized physical evidence including a beige pajama top and a window pane. The pane was found in a closet between a chest of drawers and the wall of the closet. Upon examination, the police dis-

covered that the pane was the same one taken from Mrs. Hilger's back porch.

Subsequently, the defendant signed a written statement taken during the fourth interrogation session. The statement was prepared and witnessed by Detective Lindsey. The statement reads as follows:

"In the evening of 1-5-82, I, Christopher Gutknecht, was drinking in a tavern I know as Hondos. A guy gave me a hit of LSD, and I took it. I had also taken some speed earlier in the evening. I got a ride home at about 11:30 p.m. with some people I don't know. I went to bed, and sometime during the night I remember being outside of another apartment in the complex. The lights in the apartment were on. The next thing I remember I was inside the apartment with the window glass in my hand. I saw a woman standing by the table. I went into the bathroom, and then I left with the window glass from the back door, and went home, and put the glass in my closet. I have read the above statement and it is true. [Signed Christopher Gutknecht.]"

As noted above, defendant's restraint after first requesting to leave amounted to an arrest, a lawful arrest based on probable cause. Defendant argues that his first request to go home was tantamount to a manifestation of his desire to terminate questioning and since the interview did not stop his right to refuse to speak was not "scrupulously honored." (*Miranda v. Arizona* (1966), 384 U.S. 436, 479, 16 L. Ed. 2d 694, 726, 86 S. Ct. 1602, 1630.) Subsequent statements made by defendant were therefore made involuntarily and should not have been admitted as evidence at trial.

■ We do not believe the evidence supports defendant's argument. Probable cause for arrest existed at the time the arrest was made. The arrest was made only after defendant requested to go home and was prohibited from doing so. The record establishes that once arrested, the defendant never asserted his rights to terminate questioning or remain silent until after informing the police of his involvement with drugs and alcohol and that he might have burglarized Mrs. Hilger's apartment the night before. The record does not establish coercion or improper influence or abuse. The defendant's initial statement was given with full knowledge of his *Miranda* rights. Defendant's written statement was also similarly obtained. We are not persuaded that defendant's statement confiding that it was possible he committed the burglary was obtained involuntarily. Nor do the circumstances surrounding his written statement indicate that his rights were violated.

Finally, defendant argues that the evidence was insufficient to prove that he had the requisite state of mind to commit the offense of

residential burglary. (Ill. Rev. Stat. 1981, ch. 38, par. 19—3.) In particular, he argues that his alleged drugged and intoxicated condition on the night of the burglary absolves him from criminal responsibility in that it negatives the existence of knowledge of entry and intent to commit a felony or theft. Defendant relies upon the affirmative defense of intoxication (Ill. Rev. Stat. 1981, ch. 38, par. 6—3), which provides:

"A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition either:

(a) Negatives the existence of a mental state which is an element of the offense; ***."

Defendant characterizes his conduct as irrational and that he was probably suffering from temporary psychosis during the incident in question. He argues that his power consciously to form an intent was suspended. He relies in part on the testimony of an expert on the effects of controlled substances on the human mind who concluded that all of the actions described in a hypothetical based on the evidence would be consistent with delusions and lack of intent. He also relies upon those actions described which included Mrs. Hilger's testimony that he did not appear to know what he was doing, his talking to "people that weren't there," his expectation of Mrs. Hilger having visitors at 3 a.m., his cutting of her phone line and breaking her radio, his declaration that the pane of glass was worth $1,000, and the fact that he had an opportunity to take her belongings but left with nothing but the pane.

The State responds that the facts of the case show that the defendant acted knowingly and with the intent to commit aggravated battery or theft when he entered Mrs. Hilger's apartment. His actions were those of a bold and calculating criminal who knew the risks and danger of the crime and took premeditated measures to avoid detection. The State points out that the intruder carefully removed the pane of glass from the window. He wore a ski mask to avoid identification and gloves to avoid leaving fingerprints. He constantly kept the knife at the victim's throat and threatened her that he would return if she "squealed on him." He cut the phone cord so she could not summon help and was very apprehensive about being detected by someone in the upstairs apartment. He threw her on the floor and threatened to kill her.

Where some evidence supports the defense of intoxication, the question is for the jury to determine whether it has been established. (*People v. McGuire* (1960), 18 Ill. 2d 257, 163 N.E.2d 832.) If the evidence is sufficient to raise the defense, the burden is on the State to rebut it by proving the defendant knew what he was doing when he committed the offense. (*People v. Hayes* (1976), 37 Ill. App. 3d 772, 347

N.E.2d 327.) Whether or not the State has sustained its burden is a factual determination to be made by the jury. (*People v. Jones* (1978), 67 Ill. App. 3d 477, 384 N.E.2d 523.) Similarly, it is well settled in Illinois that the question of whether the defendant was so intoxicated or drugged as to be incapable of forming the requisite intent to commit a crime is a question of fact for the trier of fact. (*People v. Fields* (1978), 56 Ill. App. 3d 1068, 372 N.E.2d 980.) For the affirmative defense to obtain, the condition of intoxication must be so extreme as to suspend all reason. (*People v. Williams* (1973), 14 Ill. App. 3d 789, 303 N.E.2d 585.) "There are many degrees of intoxication through which an individual may pass before reaching the level of intoxication at which his power of reason is entirely suspended so as to render him incapable of any mental action, such as forming the specific intent to commit a crime." (37 Ill. App. 3d 772, 774, 347 N.E.2d 327, 329.) The jury found the defendant guilty of residential burglary and by doing so found the defendant's alleged intoxication and drugged condition insufficient to negative knowledge and intent. It is apparent from the record that the jury was properly instructed regarding these elements. "This court will not substitute its judgment for that of the jury in cases in which the facts could lead to either of two inferences unless the inference accepted by the jury is inherently impossible or unreasonable." (*People v. Parker* (1976), 35 Ill. App. 3d 870, 874, 343 N.E.2d 52, 55.) We do not believe it was impossible or unreasonable for the jury to conclude that the defendant either knew what he was doing or had the requisite intent to commit aggravated battery or theft when he entered the victim's apartment. The expert himself testified that it was possible that the defendant might have known what he was doing. Further, the commission of aggravated battery is some evidence that he entered with the intent to commit that offense. The jury was not bound to believe that the defendant was even intoxicated when the burglary occurred. The only direct evidence of intoxication was that related by the police based on what the defendant told them. We believe the jury's finding was not inherently impossible or unreasonable.

The judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

WELCH, P.J., and HARRISON, J., concur.